(No. 56658.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. KURT BARTALL, Appellee.

*Opinion filed October 21, 1983.—Rehearing denied December 2, 1983.*

WARD, J., took no part.

Neil F. Hartigan and Tyrone C. Fahner, Attorneys General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, Michael E. Shabat, Joel A. Stein, Rhoda W. Davis, and Kevin Sweeney, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

Edward J. Egan, Ltd., of Chicago, for appellee.

JUSTICE SIMON delivered the opinion of the court:

In the early morning hours of December 30, 1979, the defendant, Kurt Bartall, fired two shots from his automobile as it traveled along Milwaukee Avenue in Chicago. One of these shots killed a young woman who was standing in an adjacent parking lot. In a jury trial in the circuit court of Cook County the defendant was convicted of murder and armed violence and was sentenced to imprisonment for 20 years.

The appellate court, with one justice dissenting, reversed the defendant's conviction. (105 Ill. App. 3d 867.) The majority of the appellate court concluded that it was reversible error for the trial court to admit evidence of a shooting incident that occurred nearly 20 hours after the homicide. The dissenting justice's view was that the subsequent shooting incident was admissible to establish the context of the defendant's arrest. (105 Ill. App. 3d 867, 875 (Linn, J., dissenting).) He also suggested that even if it was improper to admit the subsequent shooting incident, this error was harmless beyond a reasonable doubt in view of the overwhelming evidence of the defendant's guilt.

This court granted the People's petition for leave to appeal (87 Ill. 2d R. 315(a)). The defendant contends that his conviction must be reversed because he was not proved guilty of murder beyond a reasonable doubt, because the trial court improperly admitted evidence of the subsequent shooting incident, because the trial court committed other errors, and because the prosecutor made inflammatory and highly prejudicial remarks in his opening and closing statements. Finding no reversible error among these claims, we reverse the judgment of the appellate court and affirm the decision of the circuit court.

THE EVIDENCE AT TRIAL

On the evening of December 29, 1979, the victim, Betty Quinn and a friend, Eileen Kampwirth, visited a tavern at 5840 North Milwaukee Avenue in Chicago. Quinn parked her automobile in a grocery store parking lot about half a block away. The lot was adjacent to the southeast-bound lanes on Milwaukee Avenue, and Kampwirth testified that Quinn's automobile was parked 12 feet inside the curb.

At the tavern the two women met Mark Tatum and Bill Will, friends of Kampwirth. At about 2:30 a.m. on the morning of December 30, 1979, the four left the tavern together and went to Quinn's automobile. Kampwirth and Will both testified that as the group stood in the parking lot there were no parked cars, walls or other obstructions between them and the street. Suddenly, Kampwirth heard a gunshot which sounded like "a very loud firecracker." Will, on the other hand, heard two bangs no more than 45 seconds apart. Shortly after the first bang Will saw Quinn as she "looked out towards Milwaukee Avenue." After the second shot he saw an automobile heading away from the parking lot. The automobile appeared to be traveling at the speed limit in the inside northwest-bound lane of Milwaukee Avenue. Both Will and Kampwirth turned to look at Quinn, who had been standing the closest to Milwaukee Avenue, and found her lying on the ground bleeding profusely from the face.

Will also testified that he lives near the parking lot and that on occasic he has walked at night on the sidewalk across the street from it. He stated that on such occasions the light from the street lamps was sufficient to illuminate objects in the parking lot.

Shortly after the shooting, Quinn was pronounced dead at a nearby hospital. A physician who performed an autopsy testified that the victim died from a bullet

wound to the head. At the time of the autopsy the victim was 5 feet 6 inches tall, and a bullet entrance wound was found on the rear of her head about three inches from the top. The wound followed a horizontal course through the victim's head, and a bullet exit wound was located near the right upper eyelid. Two bullet jacket fragments were recovered in the course of the autopsy.

Police evidence technicians also recovered a bullet from a dry cleaners located several doors down Milwaukee Avenue from the parking lot. This bullet had left a hole in the front window of the building about six feet off the ground.

Over the defendant's objection the trial court admitted evidence of a subsequent offense by the defendant in order to establish his intent in the Quinn homicide. The testimony of Kathy Preze provided most of the evidence of the subsequent offense. Preze testified that at about 10:30 p.m. on December 30, 1979, she was driving her automobile northbound on Milwaukee Avenue when a silver automobile with license number KB 26 swerved in front of her and braked hard. Preze swerved into another lane and a short time later heard a noise that sounded like a firecracker. As the vehicles continued down the highway a man in the driver's seat of the other automobile, whom she later identified as the defendant, made an obscene gesture at her and pointed a gun at her face. Preze swerved her automobile into oncoming traffic to avoid the gun and heard another noise that sounded like a firecracker. The defendant's automobile then "turned off its lights and sped away."

Preze immediately reported the incident to the Niles police department, and the defendant and Cindy Kerstein, his fiancee, were apprehended within the hour. At the time of his arrest the defendant was wearing a shoulder holster which contained a loaded handgun. Two empty rounds and a box of live ammunition were found

on the floor of the defendant's automobile. Preze was in the Niles police station as the defendant and Kerstein were brought in, and she testified she heard the defendant call out several times to his fiancee: "[D]on't tell them anything, we'll get out of this one. Just don't tell them anything." In the station it first occurred to Preze that the defendant was an acquaintance of her family.

An inspection of Preze's vehicle revealed a bullet hole in the fender above the right rear tire, and about two months after the incident Preze discovered a bullet lodged in a box in the trunk of her automobile. Sergeant Vincent Lomoro, a police evidence technician, compared this bullet and the bullet fragments recovered in the autopsy of Betty Quinn with bullets test fired from the gun the defendant was carrying at his arrest. He concluded that the bullet fragments and the bullets were all fired from the defendant's gun.

Frank Cappitelli, a Chicago police detective, visited the parking lot on Milwaukee Avenue between 2:30 a.m. and 3 a.m. on the morning of the homicide and observed that the lighting in the area was sufficient to illuminate the surrounding buildings and automobiles on Milwaukee Avenue. The following evening Detective Cappitelli interviewed the defendant at the Niles police station and told him that he was investigating a homicide which had occurred on Milwaukee Avenue in the preceding day or so. The defendant expressed a willingness to talk with the detective, but denied having been on Milwaukee Avenue the evening before or having committed a shooting there. He stated that he was in Elkhorn, Wisconsin, with his fiancee and that the weapon recovered by the Niles police had been purchased in Wisconsin at about 10 a.m. on the morning of December 30.

The detective returned the following morning, and in this interview the defendant gave him another statement. The detective testified:

"[The defendant] stated that at approximately 11:30 in the p.m. on 29th December '79 he was on Milwaukee Avenue with his girlfriend Cindy Kerstein, that they were proceeding northwest on Milwaukee Avenue, that he fired two shots at approximately the 5700 or 5800 block on Milwaukee Avenue, that before he fired the shots he looked around to see if there was any police or anyone else. He stated at that time he didn't see anyone. He then stated he looked into the parking lot and did not see anyone in the parking lot. He also told me that when he fired the weapon, he used his left hand out the window in an upward direction." [The record reflects that the detective bent his left arm at the elbow and pointed his hand towards the ceiling of the courtroom.]

When the detective told the defendant that "it was virtually impossible or impossible for him to fire a weapon from this position and have the path of the bullet strike the objects that we assumed they did strike" the defendant admitted that "well, maybe it wasn't like this." The defendant also told the detective that after the shooting he and Kerstein had proceeded to Elkhorn, Wisconsin, and returned to Chicago late the following evening.

The prosecution offered several exhibits which were received in evidence, including pictures of the scene of the homicide, a picture of the victim, a picture of the defendant, a picture of the bullet hole in the fender of Preze's automobile, and pictures of the defendant's automobile. The court also arranged for the jury to view the scene of the homicide during the nighttime.

Cindy Kerstein was the only witness for the defense. She testified that in the early morning hours of December 30, 1979, she was with the defendant as he drove his silver Thunderbird down Milwaukee Avenue in Chicago. They had been driving around for several hours without incident, but as they reached the 5700 block of North Milwaukee Avenue she heard a gunshot come from where the defendant was sitting. Almost immediately she heard a second shot. Kerstein screamed at the defendant and asked him what

he was doing. The court sustained an objection by the prosecutor and did not permit Kerstein to testify concerning the defendant's response to her query.

Kerstein also testified that it had recently snowed and the windshield and windows of the car had so much dirt and slush on them that one could not see out of them. She claimed that she did not see any people on the sidewalk when she heard the defendant fire the shots, but the prosecution offered her sworn testimony at the preliminary hearing in which she stated that after the gunshot she saw people on the sidewalk on the defendant's side of the automobile. Moreover, she admitted on cross-examination that she did see people on the sidewalks in another block farther down on Milwaukee Avenue.

Kerstein testified that after the shooting she and the defendant drove to the defendant's summer home in Wisconsin and spent the night there. The following evening they returned to Chicago and were driving on Milwaukee Avenue near Devon when she felt the defendant hit his brakes and swerve the vehicle around a parked automobile. She reported that the defendant was angry and said, "They cut me off. They cut me off." She testified that the defendant said he was going to shoot out the tires on the other vehicle, but when the prosecutor objected, this remark was stricken from the record. Shortly after the defendant made these remarks, Kerstein heard a gunshot coming from where the defendant was sitting.

On cross-examination the prosecutor attempted to impeach the value of Kerstein's testimony by questioning her about a false statement she had made to police in which she had first told them that at the time Quinn was killed, she and the defendant were in Wisconsin and that she had never seen the gun found on the defendant at his arrest.

## THE SUFFICIENCY OF THE EVIDENCE

"In criminal cases *** it is our duty, where a verdict of

guilty is returned by a jury or where a similar finding is made by a court ***; not only to carefully consider the evidence but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged." *People v. Jordan* (1954), 4 Ill. 2d 155, 156.

Here, the defendant contends that the prosecution failed to prove him guilty of murder beyond a reasonable doubt because it did not establish that he had the mental state required for that crime when he shot the victim from his automobile. In his brief the defendant admits that "[t]he killing of Betty Quinn was a senseless, tragic occurrence," but he contends that he was, at most, reckless in shooting her and that, at worst, he is guilty not of murder but of involuntary manslaughter.

"The common-law distinctions between murder and manslaughter have always involved considerations of degree [citations], and similar considerations appear in the Code definitions" of those crimes. (*People v. Davis* (1966), 35 Ill. 2d 55, 60.) Section 9—1(a) of the Criminal Code of 1961 defines the crime of murder and provides in part that "[a] person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death *** [h]e *knows that such acts create a strong probability of death or great bodily harm to that individual or another.*" (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2).) On the other hand, the Code defines the crime of involuntary manslaughter as requiring only "reckless" conduct of a type "likely to cause death or great bodily harm to some individual." (Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a).) "A person is reckless or acts recklessly, when *he consciously disregards a substantial and unjustifiable risk that* circumstances exist or that *a result will follow* ***; and such disregard constitutes a gross deviation from the standard of care which a reason-

able person would exercise in the situation." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 38, par. 4—6.

To prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results. "It is sufficient to show that he voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life." (*People v. Latimer* (1966), 35 Ill. 2d 178, 182-83.) In *People v. Cannon* (1971), 49 Ill. 2d 162, for example, the defendant was found guilty of murder notwithstanding his testimony that he had accidentally killed the victim when he shot into the air over a crowded playfield to warn a rival gang member against attacking him with a baseball bat. In affirming the murder conviction this court observed that the defendant "intended to fire the gun and did in fact point it and shoot in the decedents' general direction. This act, done voluntarily and wilfully, is sufficient evidence of the intent requisite to constitute the offense of murder." 49 Ill. 2d 162, 166; *cf. People v. Gonzales* (1968), 40 Ill. 2d 233, 241-42 (where defendant admitted firing a shotgun into a group of men standing in front of a tavern, no error occurred in denying a manslaughter instruction); *Mayes v. People* (1883), 106 Ill. 306, 313 (" '*** if a man, knowing that people are passing along the street, throw a stone likely to do injury, or shoot over a house or wall with intent to do hurt to people, and one is thereby slain, it is murder on account of previous malice, though not directed against any particular individual ***,' " quoting F. Wharton, Homicide 45).

Whether the defendant is guilty of murder because his acts created a "strong probability" of death or great bodily harm or whether he is guilty of involuntary manslaughter because his acts create a "substantial and unjustifiable risk" of such results is a question for the trier of fact. (See *People v. Davis* (1966), 35 Ill. 2d 55, 61.) In this case the jury was instructed on both crimes and found the defend-

ant guilty of murder. "[T]his court will not disturb that finding unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt." (*People v. Jordan* (1960), 18 Ill. 2d 489, 492-93; *People v. French* (1972), 3 Ill. App. 3d 884, 887.) After reviewing the evidence in this case we find that it amply supports the jury's verdict.

The defendant contends that unless he knew that the people were in the parking lot he could not have known that his actions created the "strong probability" of death or great bodily harm that would justify his conviction of murder. He argues that the State did not provide sufficient proof that he saw the group of people in the parking lot. We disagree.

In his statement to police the defendant admitted that before he discharged his weapon he looked around for police and pedestrians on Milwaukee Avenue and that he looked into the parking lot. Although he also stated that he saw no one, there was considerable evidence from which the jury could reasonably infer the contrary. Both Bill Will and Eileen Kampwirth testified that there were no parked cars or other obstructions between the group in the parking lot and the defendant's automobile. Moreover, Bill Will and Detective Cappitelli both testified that the lighting in the parking lot and on Milwaukee Avenue was more than sufficient to illuminate objects in the lot. The court also permitted the jury, without objection by the defendant, to evaluate the lighting conditions at the scene in a visit during the nighttime.

The defendant's fiancee testified that the windshield of the defendant's automobile was dirty from a recent snow and that she saw no one on the street at the time of the shooting. This testimony, however, was partially impeached by her testimony at the preliminary hearing in which she admitted seeing people on the street shortly after the

shooting. Moreover she admitted in her testimony at trial that she saw people on the sidewalk farther up the street. In any case, the defendant had to lower his window before firing the first shot, and according to Detective Cappitelli the defendant told him he did look into the parking lot before firing his gun. From all this evidence the jury could have reasonably inferred that dirty windows did not prevent the defendant from seeing the group in the parking lot.

The defendant told police that he shot his weapon into the air over the parking lot, but he admitted after further questioning that "maybe it wasn't like this." Under the rationale of *Cannon,* even the discharge of his weapon into the air over the group of people in the parking lot would be sufficient to create a "strong probability" of death or great bodily harm provided that he saw them. We agree with the appellate court that there was sufficient evidence for the jury to infer "that the defendant voluntarily fired a gun in the direction of a group of people he saw standing in a parking lot" (105 Ill. App. 3d 867, 872) and that this inference supports the jury's verdict of guilty on the murder charge.

### ISSUES RELATING TO THE EVIDENCE
### OF ANOTHER CRIME

The appellate court reversed the defendant's conviction, holding that the trial court erred in admitting evidence of the Preze shooting incident which occurred nearby 20 hours after the Quinn homicide. We hold that the admission of this evidence was proper in order to show the defendant's intent in the prior shooting.

In *People v. McKibbins* (1983), 96 Ill. 2d 176, we recently reviewed the law in Illinois concerning the admissibility of "other crimes" evidence:

"Generally, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129.)

> Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake. (*People v. Baptist* (1979), 76 Ill. 2d 19; *People v. Gonzales* (1978), 60 Ill. App. 3d 980; see generally 2 Wigmore, Evidence sec. 304 (Chadbourn rev. ed. 1979).) In fact, this court has held that *evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. People v. McDonald* (1975), 62 Ill. 2d 448, 455; *People v. Dewey* (1969), 42 Ill. 2d 148, 157." (Emphasis added.) (96 Ill. 2d 176, 182.)

In *McKibbins* we approved the admission of evidence of a subsequent robbery in the defendant's trial for murder and armed robbery in order to show the defendant's intent and the context of his arrest.

Evidence of another crime, however, may be used only when the other crime has some threshold similarity to the crime charged. It is this similarity which increases the relevance of the evidence and ensures that it is not being used solely to establish the defendant's criminal propensities.

That the defendant killed Quinn was convincingly established by ballistics evidence, Kerstein's testimony and his own statement to the police. The principal issue in the case was whether he shot Quinn with the mental state required for murder or whether he shot her as a result of mere inadvertence or recklessness. Thus, the prosecution asks us to uphold the trial court's admission of the subsequent shooting on the grounds that it was offered "to prove the absence of an innocent frame of mind or the presence of criminal intent. In such a case, mere general areas of similarity will suffice." *People v. McKibbins* (1983), 96 Ill. 2d 176, 185-86.

There are striking similarities between the Preze shooting and the Quinn homicide, which occurred only 20 hours earlier. In both incidents the defendant fired the same handgun out of the window of his silver Thunderbird as he drove at night in a northwesterly direction on the same stretch of Milwaukee Avenue in Chicago. Both attacks

were apparently unprovoked, and on both occasions he was accompanied by Kerstein.

The defendant contends there are several differences between the two shootings which eliminate any "general similarity" between the two crimes. While the Quinn homicide was an unprovoked attack on an unknown victim, the second incident was provoked by a "traffic incident" and committed against a victim known to the defendant. Moreover, after the Preze shooting the defendant "sped" away, while after the Quinn homicide Will reported that he left the scene at a normal rate of speed.

These distinctions either do not diminish the relevance of the Preze shooting on the issue of intent or are not borne out by the evidence. Kathy Preze described the shots taken at her as a completely unprovoked attack. The only hint of a traffic incident came from Kerstein, but she admitted that she was asleep at the time the incident commenced. Moreover, although Preze knew the defendant as a family friend she did not realize this until she saw him in the Niles police station, and there is no suggestion that the defendant recognized her before that time either.

The defendant's rapid flight from the Preze shooting has little relevance on the issue of intent. In the Preze shooting the defendant had fired at close range at a victim in a vehicle and because of the greater likelihood of identification or pursuit by the victim the defendant had more reason to flee rapidly than after the shooting which killed Quinn.

We believe that the Preze shooting incident was sufficiently similar to the Quinn homicide to make it admissible on the issue of intent. The evidence of the Preze shooting showed more than the defendant's general propensity to commit crime; it established that on at least two occasions within 24 hours the defendant had acted as a roving, mobile sniper. Whereas the Quinn homicide, standing alone, might have some ambiguity about it, the two incidents,

taken together, increase the certainty that the defendant deliberately acted in this fashion. (*Cf.* 2 Wigmore, Evidence sec. 302 (Chadbourn rev. ed. 1979).) This evidence, taken with other evidence in the case, could provide the basis for an inference that the defendant had the criminal intent required for murder. "The evidence was thus relevant for a purpose other than to show the defendant's propensity to commit crime and was therefore admissible." *People v. McKibbins* (1983), 96 Ill. 2d 176, 186.

The defendant argues that although the prosecution may use evidence of *prior* criminal acts to show intent in the crime charged, it may not use evidence of *subsequent* criminal acts for that purpose. Some Illinois authority does support this proposition:

> "It is contrary to the theory of our criminal law to presume that a defendant has been a criminal from his birth or from any former period of time or that he has a guilty intent, in the absence of proof that he has formerly committed a criminal act. His first offense must be held to be the beginning of his criminal career, and in every such case every element of the crime must be proved and not presumed from subsequent acts alone." (*People v. Hobbs* (1921), 297 Ill. 399, 413.)

See also *People v. Brand* (1953), 415 Ill. 329, 338-39, *cert. denied* (1954), 347 U.S. 959, 98 L. Ed. 1103, 74 S. Ct. 709 ("We have repeatedly held that evidence of the commission of subsequent crimes is not admissible for the purpose of proving guilty knowledge or intent in the absence of proof that the defendant has formerly committed similar offenses ***").

But we believe that these cases no longer state the law in Illinois. This court has held that when "the question is whether the defendant's conduct evidenced a peculiar plan to commit a particular offense, *** we see no reason to exclude conduct occurring subsequently." (*People v. Lehman* (1955), 5 Ill. 2d 337, 343.) Likewise, in *People v. Tipton* (1980), 78 Ill. 2d 477, 484-87, this court held that a subse-

quent crime was admissible to show the defendant's predisposition to commit the prior offense when the defendant had raised an entrapment defense. This court has also allowed subsequent-crimes evidence to be offered on the issue of "intent," in a case in which the *Hobbs* distinction between prior and subsequent crimes was not raised by the parties. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 186.) In *McKibbins* we emphasized that relevance to the crime charged is the primary test for the admissibility of other-crimes evidence:

> "Although [the defendant] may not have directly and actively participated in the actual robbery and murder, his involvement in the subsequent offense with the same two companions and the other similarities noted tend to establish that he participated in the previous offense with the necessary criminal intent. The evidence was thus relevant for a purpose other than to show the defendant's propensity to commit crime and was therefore admissible." 96 Ill. 2d 176, 186.

The Illinois Appellate Court has also observed in *People v. Allen* (1971), 1 Ill. App. 3d 197, 201, that the *Hobbs* distinction between prior and subsequent crimes "seems to have been peculiar to Illinois (see *Annot.*: 42 A.L.R.2d 854-890 \*\*\*) and moreover, not consistently adhered to in the Illinois cases in *every* instance in which intent was in issue. [Citations.]" The appellate court held in *Allen* that subsequent crimes are as admissible as prior crimes provided that they have "independent relevance to an issue in the case" (1 Ill. App. 3d 197, 201). See also *People v. Rogers* (1975), 31 Ill. App. 3d 981, 985.

This conclusion is consistent with the admission of evidence of conduct subsequent to the criminal act charged for other purposes (see, *e.g., People v. Harris* (1972), 52 Ill. 2d 558, 561 (flight by defendant admissible to show consciousness of guilt); *People v. Armstrong* (1976), 43 Ill. App. 3d 586, 595 (hiding by defendant admissible to show consciousness of guilt); *People v. Meeks* (1978), 59 Ill. App.

3d 521, 527 (false exculpatory statement admissible as circumstantial evidence to show consciousness of guilt), and with the law in other States, see, *e.g., State v. Wyman* (Me. 1970), 270 A.2d 460 (subsequent assault with automobile on two people admissible to show intent in a similar attack an hour earlier); *Ashley v. State* (Fla. 1972), 265 So. 2d 685 (subsequent robbery and homicide admitted to show intent in robbery and homicide that occurred several hours earlier); see generally 2 Wigmore, Evidence sec. 363, at 350 (Chadbourn rev. ed. 1979) (other crimes used to prove intent in homicide cases "may have been done even at a subsequent time")). There is no valid reason for limiting the availability of subsequent-crimes evidence in cases where it is used to show "intent" but not in cases where it is used to show *"modus operandi."*

The defendant argues that even if evidence of the Preze shooting was admissible, the trial court erred in allowing the prosecution to admit *details* of the shooting, especially when it had issued an order to the contrary. The defendant also argues that the trial court erroneously instructed the jury that it could use evidence of the Preze shooting to prove the defendant's identity and presence when the prosecutor had represented that it only wanted to use the evidence on the issue of intent.

Prior to trial, the court considered the defendant's motion *in limine* to exclude evidence of the Preze shooting. At that hearing the prosecutor stated, "[W]e are centering in on the use of another crime so [*sic*] proof on an issue or element in our case to prove a design, a lack of mistake, and an intent to act in a certain way." Later in the same hearing he stated, "[W]e are not offering it to bolster or to prove or to add in any way to the issue of identification. We are merely offering it to prove a necessary element of our crime[:] knowledge that the acts created a strong probability of death or great bodily harm."

Shortly before ruling, the court observed:

"[I]dentification is not in the area, as [the prosecutor] points out it is his intention of *** showing the subsequent acts to prove *** the intention, knowledge, willfulness on the part of the defendant. He's not going to show the details of the crime. And, in fact, if I do allow [the prosecution to use the evidence] I'm going to restrict him to that area."

The court referred to this restriction in its order allowing the prosecution to admit evidence of the Preze shooting.

The defendant objects that the court failed to enforce its restriction on admitting details of the second offense. The defendant contends that the prosecution was allowed to put on a trial within a trial with the detailed testimony of Kathy Preze, the ballistics testimony on the bullet found in the trunk of Preze's automobile, and the photographic evidence of the bullet hole. We agree that it was not necessary to conduct a mini-trial of the Preze incident in order to establish sufficient acts from which the defendant's intent in the parking lot shooting might be inferred, "and for the sake of economy of judicial time, we advise against such detailed evidence of other offenses." (*People v. McKibbins* (1983), 96 Ill. 2d 176, 187.) The trial court should carefully limit evidence of another crime to evidence that is relevant to the issue on which the other crime is admitted. However, as we held in *McKibbins,* "we cannot say that the detailed evidence in this case constituted prejudicial error." 96 Ill. 2d 176, 187.

The defendant also argues that the trial court erred in instructing the jury that evidence of the Preze shooting "has been received solely on the issue of the defendant's identification, presence, intent and design." This instruction was erroneous, the defendant maintains, because it allowed the jury to consider the evidence of the Preze shooting on the issues of identification and presence.

The defendant, who was represented by different counsel in the trial court than on this appeal, did not object to the other-crimes instruction on this ground in the trial

court. The only objection made there was "to including the defendant's intent and design as one of the purposes of the evidence of the other offense." The defendant's attorney specifically stated that, as for other aspects of the instruction, "there is no objection."

In any case, this instruction could not have prejudiced the defendant, and even if erroneous, it was harmless error. This is not a case where an improperly broad instruction on the use of other crimes increased the prejudice resulting from the improper admission of other-crimes evidence (*People v. Connors* (1980), 82 Ill. App. 3d 312, 320). In this case evidence of the Preze shooting was properly admitted on the issue of intent, and the instruction was not so broad or confusing that the jury could not properly use the evidence for that purpose. As the defendant concedes, his statement to police, ballistics evidence, and Kerstein's testimony overwhelmingly established his identity as the assailant and his presence at the scene of the crime. That aspect of the defendant's activities at the time of the Quinn homicide was never seriously questioned by the defense and, in view of the evidence, could not have been. We can therefore say beyond a reasonable doubt that the jury's verdict could not have been different had the portion of the instruction relating to the defendant's identification and presence been deleted.

### OTHER ALLEGED ERRORS

The defendant advances numerous other alleged errors in his trial as grounds for reversing his conviction. Among these we find no reversible errors.

### EVIDENCE CONCERNING THE VICTIM'S INJURIES

The defendant argues that the trial court erred in allowing the prosecution to admit inflammatory and highly prejudicial evidence that described gruesome details about

the victim's injuries. In particular, the defendant objects (1) to Eileen Kampwirth's testimony that after the shooting she tried to give the victim mouth-to-mouth resuscitation but that the victim "was bleeding through the mouth, so I turned her head and tried to get the blood out, but I couldn't. It was just blood"; (2) to Bill Will's testimony that when he retrieved his coat which had been placed under the victim's head he got blood all over himself and that the coat "was drenched with blood"; (3) to Will's testimony that a photograph depicting the scene of the crime included "napkins *** trying to soak up the blood on the pavement"; and (4) to the trial court's decision to show the jury a picture of the victim's wounds.

The defendant has waived any error in Will's description of the photograph because his counsel failed to make an objection in the trial court to the admission of this evidence. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282; *People v. Baske* (1978), 66 Ill. App. 3d 590, 600.) Moreover, Will's testimony on this matter was not prejudicial enough to constitute plain error.

The defendant's counsel did object to Will's testimony describing the blood on his coat, but the remarks were stricken from the record and the jury was instructed to disregard them. The immediate objection by the defense counsel which was sustained by the trial court and the instructions to the jury cured any error in the prosecution's attempt to admit this testimony. (*People v. Yonder* (1969), 44 Ill. 2d 376, 392, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094; *People v. Bakutis* (1941), 377 Ill. 386, 390.) In some cases, sustaining an objection and appropriate instructions to the jury may not be sufficient to cure an error involving the admission of prejudicial evidence (see, *e.g., People v. Hal* (1962), 25 Ill. 2d 577, 580), but in this case we do not consider Will's testimony so inflammatory or prejudicial that a proper instruction did not cure any error; after all, it should not have been surprising

to the jury that a person who received a head wound of the type Quinn did would bleed profusely.

The trial court properly admitted, over the defendant's objection, Kampwirth's testimony concerning the victim's injuries. This court held in *People v. Speck*:

> " '*** A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant.' " (*People v. Speck* (1968), 41 Ill. 2d 177, 202-03 (quoting *People v. Jenko* (1951), 410 Ill. 478, 482),*rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.)

Kampwirth's testimony tended to establish the location and nature of the victim's injuries shortly after the wounds were inflicted. These issues were relevant to the proceeding, and we do not regard the trial court's decision to admit this evidence as an abuse of discretion.

Likewise, the decision to admit exhibits into the jury room is primarily within the discretion of the trial court, and after viewing the photograph of the victim's injuries and observing that it had some relevance to the question of whether she could have been shot in the head from a passing vehicle, we hold that the trial court did not abuse its discretion in submitting it to the jury.

### THE DEFENDANT'S HEARSAY DECLARATION OF INTENT

The defendant also contends that it was reversible error

for the trial court to exclude Kerstein's testimony that the defendant had stated that he was going to shoot out the tires on Preze's automobile. This statement falls within the definition of hearsay—an out-of-court statement by the declarant offered to prove the truth of the matters asserted (*People v. Rogers* (1980), 81 Ill. 2d 571, 577)—and the trial court sustained the prosecutor's objection to it and struck the remarks from the record.

The defendant, however, contends, among other theories, that this testimony should have been admitted under the *statement of intent* exception to the hearsay rule, and we do not dispute that contention. (See *People v. Hampton* (1969), 44 Ill. 2d 41, 46 *(per curiam)*; *People v. Osborne* (1917), 278 Ill. 104, 109; *Quick v. Michigan Millers Mutual Insurance Co.* (1969), 112 Ill. App. 2d 314, 320; see also E. Cleary & M. Graham, Illinois Evidence (3d ed. 1979) sec. 803.4—.5; Fed. R. Evid. 803(3) (defining exception to hearsay rule as including "[a] statement of the declarant's then existing state of mind *** (such as intent, plan, motive, design ***")).) The defendant's statement was admissible to prove his intent in the Preze attack and to prove that he acted in accordance with that intent.

Nevertheless, the trial court's exclusion of the defendant's hearsay statement was harmless error. The hearsay statement was merely cumulative of other evidence presented by the parties in the trial which permitted the defendant to argue he had no intent to shoot Preze. In his closing argument defense counsel asked the jury to "look at the hole in [Kathy Preze's] car and *** see if that isn't more a shot fired from the back of her car rather than a shot fired as her car is forming a T with [the defendant's] and going away from him in the opposite direction ***. And then as you look at that hole, that is down, not up, and not off to the right, you see what was fired at was the back of the car of Ms. Preze, not Ms. Preze." The hearsay statement would have added nothing to the evidence al-

ready in the record, especially considering that Kerstein's credibility had been attacked on the basis of several false statements that she had made about the shooting incidents. Because the evidence that was denied admission is purely cumulative, the exclusion is harmless error and does not require reversal and remand for a new trial. See *People v. Kline* (1982), 92 Ill. 2d 490, 503-04; *Wohlford v. People* (1894), 148 Ill. 296, 300.

## REMARKS OF THE TRIAL COURT JUDGE

The defendant argues that the trial court improperly restricted his closing argument on three occasions and in doing so made prejudicial remarks from which the jury could infer that the court favored a verdict for the prosecution. On each occasion, the court sustained a prosecution objection to the defendant's argument and instructed the jury to disregard the statement.

In protecting the defendant's right to a fair and impartial trial by jury in a criminal case the trial court must carefully avoid any remarks that indicate a prejudice toward either side.

> "Ultimate decisions of fact must fairly be left to the jury, as must be the determination of the credibility of witnesses and the weight to be afforded their testimony, and to this end it is not the province of the judge, in a criminal case, to convey his opinions on such matters to the jurors by word or deed. [Citations.] As pointed out on numerous occasions, jurors are ever watchful of the attitude of the judge, and any disclosure of disbelief or hostility on his part is very apt to influence them in arriving at their verdict. [Citations.]" (*People v. Santucci* (1962), 24 Ill. 2d 93, 98.)

However, we do not find any error or lack of impartiality in the trial court's rulings and remarks in this case, and we would not be justified in reversing the defendant's conviction on that ground. *Cf. People v. Williams* (1978), 62 Ill. App. 3d 966, 973.

### PROSECUTORIAL RHETORIC

The defendant contends that 13 arguments made by the prosecutors in their opening and closing statements were so prejudicial and inflammatory that he must receive a new trial.

The defendant waived the errors, if any, in most of these arguments by failing to make timely objection to them during the trial. (*People v. Edwards* (1973), 55 Ill. 2d 25, 35, *cert. denied* (1974), 415 U.S. 928, 39 L. Ed. 2d 486, 94 S. Ct. 1438; *People v. Vaughn* (1979), 69 Ill. App. 3d 399, 401-02.) Even when no objection is made, however, inflammatory rhetoric warrants reversal when it prevents the defendant from receiving a fair trial or causes substantial interference with the fundamental integrity of the judicial process. (See, *e.g., People v. Romero* (1967), 36 Ill. 2d 315, 320; *People v. Young* (1975), 33 Ill. App. 3d 443, 447-48.) After examining the arguments to which no objections were made, we conclude that they did not so substantially undermine the fairness of the defendant's trial as to warrant reversal.

Most of the arguments that were the subject of a defense objection were either cured in the trial court or were not prejudicial. When the prosecutor argued "Let's give [the defendant] another shot, give him another shot," and "Maybe he'll blow Preze away, maybe he'll blow one of your relatives away next," the court sustained the defendant's objection, and directed the prosecutor to "cease and desist from any such *** remarks." When the prosecutor told the jury in his opening statement that "you will get a little insight into [the defendant's] character and his personality" from the evidence of the Preze shooting, the court denied the defendant's motion for a mistrial because the prosecutor's argument did not mislead the jury, but the court also stated that the jury would be thoroughly instructed on the proper use of the other-crimes evidence.

These instructions were given to the jury, and the prosecutor's passing reference to the defendant's character did not result in any prejudice to him.

Probably the strongest attack upon the prosecutor's closing argument is the defendant's complaint about the prosecutor's reference to the victim's family at the end of his closing statement:

> "Let's talk about this girl's rights. To say good night to your grandma 'good night, I'm going, be back. Can I borrow your car? Can I go back to school in a couple of days? Can I say goodbye to my brothers and sisters?'
>
> Does she have any more rights?
>
> \* \* \*
>
> She's got nothing because he took it upon himself to take the gun out of his pocket or out of his car or out of his shoulder holster and snuff her life away in a ridiculous and unmotivated and ignorant, ignorant lack of responsibility. That's what he did.
>
> You decide, ladies and gentlemen, what it's all about, you take the law, you take the evidence, you say if somebody shoots this thing it's a reckless act at four people, *and then you tell the Quinn's what you decided."* (Emphasis added.)

The family references in the first paragraph, perhaps, can be excused as fair comment on the testimony of the victim's mother, who testified without the defendant's objection as a life and death witness for the State. However, the exhortation in the last sentence of the prosecutor's argument cannot be excused on that basis.

"Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members" *(People v. Free* (1983), 94 Ill. 2d 378, 415). Thus, this court has held that "every mention of a deceased's family does not necessarily, in and of itself, entitle the defendant to a new trial, since, in certain instances, dependent upon the factual circumstances, such evidence and argument can be harmless, particularly when the death penalty is not imposed." *People v. Wilson* (1972), 51

Ill. 2d 302, 307; *People v. Jordan* (1967), 38 Ill. 2d 83, 91-92.

Considering the prosecutor's closing remark in the context of the entire case, we hold that, although the prosecutor's conduct was improper, inexcusable and unprofessional, what he did was harmless error. Unlike many of the cases where comments about the victim's family required reversal, there was no presentation of irrelevant evidence about the grieving family and the prosecution did not dwell upon the victim's family so much that "the jury could well have related this fact to the question of defendant's culpability." (*People v. Jordan* (1967), 38 Ill. 2d 83, 92; see *People v. Free* (1983), 94 Ill. 2d 378, 413-15.) In light of all this, we conclude beyond a reasonable doubt that the prosecutor's remarks about the victim's family did not affect the verdict of the jury.

## CONCLUSION

For the reasons stated, we find no reversible error in the defendant's trial, and thus we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE WARD took no part in the consideration or decision of this case.